IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAURIE ALBRIGHT, | |
| Plaintiff, | |
| v. | No. 19-cv-04853 |
| AMERICAN GREETINGS CORPORATION, NEW ALBERTSON'S INC. d/b/a JEWEL-OSCO and RICHARD CARLSON, | Judge Franklin U. Valderrama |
| Defendant. | |

MEMORANDUM OPINION AND ORDER

Plaintiff Laurie Albright (Albright) was employed by Defendant American Greetings Corporation (AGC) as a merchandiser. As a merchandiser, she would go to retailers, including Defendant New Albertson's Inc., d/b/a Jewel-Osco (Jewel-Osco), to manage and merchandise AGC products displayed inside those retail stores. Albright alleges that a Jewel-Osco supervisor, Defendant Richard Carlson (Carlson) forcefully spun her around and kissed her on one occasion and improperly touched her over a several-month period. Albright brings this lawsuit against AGC and Jewel-Osco for sexual harassment and hostile work environment in violation of Title VII of the Civil Rights Act of 1984 (Title VII), and for retaliation against AGC only in violation of Title VII. R. 1, Compl.[1] Albright has also sued Carlson in his individual

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

capacity for state law claims of assault and battery.[2] Before the Court is AGC and Jewel-Osco's motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. R. 84, AGC Mot. Summ. J.; R. 87, Jewel-Osco Mot. Summ. J. For the reasons stated below, the Court grants in part and denies in part AGC's motion for summary judgment, and grants Jewel-Osco's motion for summary judgment.[3]

## Background

### I. Local Rule 56.1 Statements and Responses

Before considering the merits of the motions, the Court first addresses certain objections to, and evidentiary issues with, certain statements of fact, and the party's respective failures to comply with the Northern District of Illinois' local rules relating to the statement of facts.

---

[2]Albright originally also named Jewel-Osco in her claims for assault and battery, which were dismissed by the Court on Jewel-Osco's motion to dismiss. R. 43, Memo. Op. and Order. The Court also dismissed a claim of negligence against both AGC and Jewel-Osco pursuant to Jewel-Osco's and AGC's motions to dismiss. *Id.*

[3]Citations to the parties' briefs are identified as follows: "AGC Mot. Summ. J." for AGC's Motion for Summary Judgment; "AGC Memo. Summ. J." for AGC's Memorandum of Law in support of its Motion for Summary Judgment (R. 85); "AGC SOF" for AGC's Local Rule 56.1 Statement of Undisputed Facts (R. 86); "Pl.'s Resp. AGC SOF" for Albright's Response to AGC's Statement of Undisputed Facts (R. 102); "Pl.'s AGC PSOAF" for Albright's Local Rule 56.1 Statement of Additional Facts as to AGC (R. 106); "Pl.'s Resp. AGC" for Albright's Response to AGC's Motion for Summary Judgment (R. 109); "AGC's Resp. PSOAF" for AGC's Response to Albright's Statement of Additional Facts as to AGC (R. 115); "AGC's Reply" for AGC's Reply in support of its Motion for Summary Judgment (R. 114); "Jewel-Osco Mot. Summ. J." for Jewel-Osco's Motion for Summary Judgment; "Jewel-Osco Memo. Summ. J." for Jewel-Osco's Memorandum of Law in support of its Motion for Summary Judgment (R. 88); "Jewel-Osco SOF" for Jewel-Osco's Local Rule 56.1 Statement of Undisputed Facts (R. 89); "Pl.'s Resp. Jewel-Osco SOF" for Albright's Response to Jewel-Osco's Statement of Material Facts (R. 101); "Pl.'s Jewel-Osco PSOAF" for Albright's Local Rule 56.1 Statement of Additional Facts as to Jewel-Osco (R. 107); "Pl.'s Resp. Jewel-Osco" for Albright's Response to Jewel-Osco's Motion for Summary Judgment (R. 108); "Jewel-Osco's Resp. PSOAF" for Jewel-Osco's Response to Albright's Statement of Additional Facts as to Jewel-Osco (R. 112); "Jewel-Osco's Reply" for Jewel-Osco's Reply in support of its Motion for Summary Judgment (R. 111).

The Court begins with Jewel-Osco's filing of a reply to Albright's response to Jewel-Osco's Local Rule 56.1(a) statement of undisputed material facts. R. 110 and 111, Reply to Albright's Resp. Jewel-Osco SOF.[4] The Local Rules provide:

> No reply to a LR 56.1(b)(2) or LR 56.1(c)(2) response is permitted without the court's permission. The moving party may use its reply memorandum of law to respond to an evidentiary or materiality objection raised in a LR 56.1(b)(2) response. The opposing party must seek permission from the court for a supplemental filing to respond to an evidentiary or materiality objection raised in a LR 56.1(c)(2) response.

LR 56.1(f).

The Seventh Circuit has repeated that "a district court may strictly, but reasonably, enforce local rules." *Igasaki v. Illinois Department of Financial and Professional Regulation*, 988 F.3d 948, 957 (7th Cir. 2021). Here, Jewel-Osco filed a reply to Albright's Rule 56.1(b)(2) response to Jewel-Osco's statement of facts without leave of Court in violation of Local Rule 56.1(f). Accordingly, the Court strikes that filing, and will not consider it in deciding Jewel-Osco's motion for summary judgment. *See Delgado v. Power Dry Chicago, Inc.*, 2021 WL 5988590, at *1 (N.D. Ill. Dec. 17, 2021) (disregarding defendant's reply to plaintiff's response to defendant's statements of fact pursuant to Local Rule 56.1 where defendant failed to seek leave of court); *Hudgens v. Wexler and Wexler*, 391 F. Supp. 2d 634, 637 (N.D. Ill. 2005) ("[t]he Court will not consider the unnecessary and improper 'replies' to Plaintiff's responses.")

---

[4]Jewel-Osco filed two purportedly duplicate replies to Albright's response to its Local Rule 56.1(a) statement of undisputed material facts. *See* R. 110, 111.

The Court next addresses certain responses to statements of fact which violate Local Rule 56(e). Local Rule 56.1(e)(2) provides, in relevant part:

> Each response must admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact. If the response admits in part and disputes in part the asserted fact, it must specify which part of the asserted fact is admitted and which part is disputed. A response may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made. A response may not assert legal arguments except to make an objection, including objections based on admissibility, materiality, or absence of evidentiary support. Motions to strike all or portions of an opposing party's LR 56.1 submission are disfavored. If a party contends that its opponent has included objectionable or immaterial evidence or argument in a LR 56.1 submission, the party's argument that the offending material should not be considered should be included in its response or reply brief. In the event that the objection is overruled, the failure to admit or dispute an asserted fact may constitute a waiver.

LR 56.1(e)(2). The rule reinforces that arguments belong in briefs, and not in responses to statements of fact, unless the argument pertains to admissibility, materiality, or absence of evidentiary support. *See id.*

AGC responds to certain assertions of fact by Albright with "does not dispute," and yet elaborates the response. *See* AGC Resp. PSOAF ¶¶ 67, 70, 88. This is improper. The Court will not consider the elaboration, which is tantamount of "set[ting] forth … facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." LR 56.1(e)(2). Where AGC does not dispute Albright's AGC PSOAF, the Court will not consider AGC's additional facts submitted in the response to that statement of fact.

Next, Jewel-Osco includes many materiality objections to Albright's Jewel-Osco PSOAF. *See* Jewel-Osco Resp. PSOAF ¶¶ 72–80, 84–88, 94, 102–104, 106–108, 110–111, 115–117, 121–125, 127–128. To the extent the Court agreed with Jewel-

Osco, the Court did not consider the asserted facts as it pertain to Jewel-Osco's motion for summary judgment. However, the Court notes many of the materiality objections were made to Albright's Jewel-Osco PSOAF that related to allegations of control or supervision, and are necessarily material to resolution of Jewel-Osco's motion for summary judgment.

The Court now turns to resolving specific evidentiary objections made in the responses to certain statements of fact.

The Court begins with Albright's objection to AGC's use of a summary as evidence of hours Albright worked for AGC in 2017, 2018, and 2019. Pl.'s Resp. AGC SOF ¶¶ 45–47. A court can only consider admissible evidence in assessing a motion for summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). In its Motion, AGC attaches an affidavit from Albright's direct supervisor, A.J. Kunde regarding various exhibits and statements of fact. *See* R. 86-2, Exh. B (Kunde Decl.), ¶ 8. Paragraph 8 of the Declaration states "I reviewed an analysis that AGC performed on Plaintiff's hours worked in the years, 2017 through 2019 and can verify that the average hours that she worked in each year are as follows: 24 hours per week in 2017, 26 hours per week in 2018, and 25 hours per week in 2019. This analysis was referenced when produced in this case as AGC2067." *Id.* The cited-to AGC2067 document, however, is not attached to the Kunde Declaration. *Id.* Albright argues that Federal Rule of Evidence (FRE) 1006 requires a proper foundation to establish the admissibility of a summary record and that the summarized documents must be made available to the opposing party. Pl.'s Resp. AGC SOF ¶ 45. Albright contends

5

that, Kunde failed to attach the underlying documents to her Declaration, and did not explain how or when the summary was prepared, or posit that it was a contemporaneous business record used during Albright's employment, and therefore it is inadmissible. *Id.*

Predictably, AGC counters that the summary is admissible. AGC Reply at 11–12. AGC maintains that a party may introduce a summary provided that the party does not misrepresent the underlying documents. *Id.* at 12 (citing *United v. White*, 737 F. 3d 1121, 1135 (7th Cir. 2013)). AGC argues that here, like in *White*, the underlying documents for the summary were provided to Albright in discovery, specifically a spreadsheet including 1400 rows detailing her work assignments over three calendar years, and that Kunde's Declaration "simply summarized the information contained therein[.]" *Id.*; Kunde Decl. ¶ 8. AGC explains that the summary was created "by dividing the total amount of annual hours by the number of weeks [Albright] worked for AGC during those years." AGC Reply at 12. Finally, AGC argues in passing that the hours summary is admissible as a business record. *Id.* n. 3.

FRE 1006 provides that a party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. "If admitted this way, the summary itself is substantive evidence-in part because the party is not obligated to introduce the underlying documents themselves." *White*, 737 F. 3d at 1135. "Because a Rule 1006 exhibit is supposed to substitute for the voluminous documents

6

themselves, however, the exhibits must accurately summarize those documents." *Id*. The Court agrees with Albright that the Court may not consider this testimony. For starters, there is no summary. Instead, the Kunde Declaration references a document that is not attached to her Declaration. Next, there is nothing in Kunde's Declaration that suggests that the summary of hours is an accurate copy as required by FRE 1006, as the document itself is missing. All that Kunde states is that she "reviewed an analysis that AGC performed on [Albright's] hours worked in the years, 2017 through 2019[,"]. This does not suffice. Nor can the Court find the omitted summary a business record, as there is no such foundation provided in the Kunde Declaration. *See Castro v. DeVry University, Inc.*, 786 F.3d 559, 578 (7th Cir. 2015) (finding that an employee's supervisor failed to lay a proper foundation for admitting evidence under Rule 803(6) where the supervisor's declaration failed to provide pertinent information as to the business's regular record-keeping practices, and where production of the evidence during litigation was not a replacement for establishing foundation). The Court will not consider AGC's purported summary of Albright's hours in deciding AGC's motion for summary judgment. Kunde Decl. ¶ 8. The Court finds *United States v. White* distinguishable. Unlike the summary admitted in *White*, here the Declaration fails to attach the summary document itself, and it is not part of the summary judgment record. Thus, the Court will not consider that statement regarding Albright's hours from the Declaration in deciding summary judgment.

Next, the Court examines AGC's objection to Albright's AGC PSOAF ¶ 62. AGC's Resp. PSOAF ¶ 62. In Albright's AGC PSOAF, Albright includes the following

statement, which AGC objects to: "'[Training Revision Specialist Kerry] O'Brien warned Albright not to report anything to anyone above Kunde because Kunde would make her life a 'living hell.' (Exh. 14 (Albright Second Dep.) at 74:23–24, 75:1–5.)" *Id.* AGC objects to this sentence as hearsay, and argues Albright is trying to use O'Brien's alleged out-of-court statement to prove the truth of the matter asserted in the statement, *i.e.*, that AGC merchandisers could not report harassment through formal channels and must go directly through Kunde. *Id.* AGC further contends that no hearsay exception applies.

"An out-of-court statement is hearsay if it is offered to prove the truth of the matter asserted." *United States v. Graham*, 47 F.4th 561, 567 (7th Cir. 2022). As the Seventh Circuit has explained, "[s]tatements introduced to show their effect on the listener are not offered to prove the truth of the matter asserted and therefore are not hearsay." *Id.* (cleaned up).[5] "A statement is offered to show its effect on the listener only of the listener heard and reacted to the statement." *Id.* While the Court does not have the benefit of Albright's response to AGC's objection, the Court finds that the statement is not hearsay if offered to show its effect on Albright, that is, where Albright thought she needed to report harassment. The Court, however, agrees with AGC that if the statement is offered to prove the truth of the matter asserted, it is hearsay and inadmissible. Therefore, the Court will only consider the statement as to its effect on Albright. *See Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019)

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

(finding police report was not inadmissible hearsay as "many of the statements were obviously not offered for their truth").

Finally, the Court considers Jewel-Osco's contention that Albright's self-serving testimony or allegations cannot defeat a motion for summary judgment. Jewel-Osco Resp. PSOAF at 2. Jewel-Osco identifies the following facts which it contends violate this principle: Albright's Jewel-Osco PSOAF ¶¶ 82–83, 90, 95–102, 109, 111, 118–120. To summarize, those allegations concern Albright's testimony on being supervised by Jewel-Osco, Jewel-Osco signing off on a form before she left the store, Jewel-Osco personnel calling her directly if they needed an extra call made, Carlson's conduct towards her and its effect, and Albright's reports to Kunde. *Id.* In support of its contention that Albright's self-serving testimony and allegations should be excluded, Jewel-Osco cites to *Ozlowski v. Henderson*, 237 F. 3d 837, 840 (7th Cir. 2001).[6]

It is true that the Seventh Circuit has said that self-serving affidavits, if not supported by the record, will not preclude summary judgment. *Ozlowski*, 237 F. 3d at 840. But the Court does not read *Ozlowski* as broadly as Jewel-Osco. In that case, the challenged statements related to plaintiff's testimony about what positions were open that he was qualified for, where plaintiff had failed to provide evidence of his qualifications, or the vacant positions and qualifications, and he had only provided

---

[6]Jewel-Osco also cites to an Illinois state court case, *Larson v. Decatur Mem'l Hosp.*, 602 N.E.2d 864 (Ill. App. 1992) which dealt with the Supreme Court of Illinois Rule 191 governing summary judgment and evidentiary affidavits. The Court does not consider that case as it has no application in resolving Jewel-Osco's summary judgment under the Court's Local Rules and the Federal Rules of Evidence.

conclusory statements. *Ozlowski*, 237 F.3d at 840. Here, the testimony identified by Jewel-Osco is from Albright's depositions, and, in large part, there is no suggestion that her testimony contradicts the record or is unsupported by the record. To be clear, this is not a situation of an allegedly "sham" affidavit, as the challenged statements are from Albright's deposition testimony. *See*, *e.g.*, *Brownlee v. Catholic Charities of Archdiocese of Chicago*, 2022 WL 602652, at *9 (N.D. Ill. Mar. 1, 2022) ("The law is well-established that 'in general, parties may not 'patch–up potentially damaging deposition testimony' with a contradictory affidavit.'") And unlike *Ozlowski*, here the statements made by Albright are primarily regarding her personal experiences, and are not speculative as to things she has no personal knowledge of. For example, her testimony that Jewel-Osco would call her if it needed an extra call made (Pl.'s Jewel-Osco PSOAF ¶ 90), or describing Carlson's actions and conduct towards her while she was at the Jewel-Osco (*id.* ¶¶ 95–100, 109, 118–120), what Albright says she told Kunde about Carlson (*id.* ¶¶101, 111), and how Kunde responded to Albright when she complained (*id.* ¶ 102). To the extent Albright's testimony conflicts with other record evidence, the Court will so note. *See*, *e.g.*, Pl.'s Jewel-Osco PSOAF ¶¶ 82–83 (parties disagree whether a Jewel-Osco supervisor needed to sign off on an Account Service Record form or not, and dispute whether Jewel-Osco supervised her, or could remove her from her assignments). All in all, the Court finds Albright's testimony, as identified by Jewel-Osco in the aforementioned paragraphs, is not speculative or lacking in foundation. *Cf. Joseph P. Caulfield & Assocs., Inc. v. Litho Prods., Inc.*, 155

F.3d 883, 888 (7th Cir. 1998) (Affidavit testimony "that was necessarily speculative and lacking in foundation ... is insufficient.")).

The Court now turns to the material facts in the case, subject to the foregoing rulings, as it relates to the challenged sexual harassment and retaliation claims.

## II. Material Facts

The following facts are set forth favorably to Albright, the non-movant, as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003). While the Court draws all reasonable inferences from the facts in Albright's favor, the Court does not "necessarily vouch[] for their accuracy." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015) (cleaned up); *see also Knopick v. Jayco, Inc.*, 895 F.3d 525, 527 (7th Cir. 2018) (cleaned up) ("Given this summary judgment lens, we do not vouch for the objective truth of all of these facts."). This background section details all material undisputed facts and notes where facts are disputed, to the extent the disputed facts are supported by record evidence.

### A. Background

AGC supplies greeting cards to retail businesses such as Jewel-Osco. Pl.'s Resp. Jewel-Osco SOF ¶¶ 3, 33. Albright worked for AGC as a part-time merchandiser, and specifically managed AGC products displayed at different retail stores. AGC's Resp. PSOAF ¶ 52; Pl.'s Resp. AGC SOF ¶ 4. Albright was originally hired by AGC in 2013, resigned in 2015, and was re-hired by AGC in 2016. Pl.'s Resp.

Jewel-Osco SOF ¶¶ 16, 25–26. Albright was 45 years old in 2018. AGC's Resp. PSOAF ¶ 52.[7]

Albright was assigned to service approximately seven different retailers at any given time, including Jewel-Osco, Meijer, Target, Wal-Mart, Big Lots, and Dollar Tree. Pl.'s Resp. Jewel-Osco SOF ¶ 19. One of the retail stores Albright was assigned to as a merchandiser was the Jewel-Osco in Lockport, Illinois. Pl.'s Resp. AGC SOF ¶ 6. Albright would service the Lockport Jewel-Osco twice per week. Pl.'s Resp. Jewel-Osco SOF ¶ 43.

Jewel-Osco is two different companies: Jewel-Osco Food Stores, Inc., the food store side of the business, and Osco Drug, Inc., the drug store side of the business. Pl.'s Resp. Jewel-Osco SOF ¶ 1.

Jewel-Osco and AGC were parties to an Amended and Restated Supply Agreement wherein AGC would provide products, including greeting cards, to Jewel-Osco, and AGC was designated as Jewel-Osco's primary greeting card supplier. AGC's Resp. PSOAF ¶ 54. Of relevance for purposes of Jewel-Osco's Motion, AGC would provide in-store merchandising services to Jewel-Osco, with the exception of certain stores where labor contracts prevented such an arrangement. Pl.'s Jewel-Osco PSOAF ¶ 76. In the stores with labor contracts, the Jewel-Osco employees would fulfill the same duties as the AGC merchandiser. *Id.* ¶ 78.

---

[7]The Court primarily cites to the PSOAF filed with Albright's Motion for Summary Judgment as to Defendant AGC, as those facts apply to both AGC and Jewel-Osco, and Albright largely repeats the same facts in her PSOAF as to Jewel-Osco. The Court will cite to the PSOAF as to Jewel-Osco only where necessary, or where the facts differ, or are in addition to facts asserted in the AGC PSAOF.

Albright's direct supervisor was A.J. Kunde, also an AGC employee, and a Field Manager. Pl.'s Resp. AGC SOF ¶ 9–10. AGC merchandisers are field-based, and do not report to an office. AGC's Resp. PSOAF ¶ 55. The merchandiser job description provides that merchandisers work with their AGC Area Supervisor to meet each retailer's needs each week, and the merchandiser would devise her own schedule to service each retailer she was assigned on a weekly basis. Jewel-Osco SOF ¶ 22. The job description also included job duties of contacting store management, completing assigned paperwork including an Account Service Record (Form 301), and in-store requirements. Pl.'s Jewel-Osco PSOAF ¶ 80; *see* R. 99-2, Exh. 4, Merchandiser Job Description. The description also included that the merchandiser would "Follow[] Chain and store policies/procedures as they affect the merchandising of the greeting card department and in matters of store security." *Id.*

Albright would receive a communication from AGC regarding service calls for the upcoming week, and then prepare her schedule, and provide it to Kunde. Pl.'s Resp. Jewel-Osco SOF ¶ 30. In her role, Albright relied upon "Best Practice" techniques, which were provided by AGC, and received other information relevant to her role from Kunde. *Id.* ¶ 18; *see also* Merchandiser Job Description. Albright would contact Kunde at the end of each workday to report what tasks she had completed, and her performance was reviewed by Kunde on a periodic basis. *Id.* ¶ 19.

AGC also provided Albright with a personal account to access the AGC online portal, and provided a tablet to Albright, where Albright could access documents, including the AGC employee handbook, communications, and weekly emails

containing assignments. Pl.'s Resp. Jewel-Osco SOF ¶ 20, 29. AGC provided the greeting cards to retailers by directly shipping them to each retail store, and provided Albright with a boxcutter to perform her work. *Id.* ¶ 21. Albright also used some of her own tools, and while on assignment at Jewel-Osco in Lockport, certain Jewel-Osco supplies, such as shopping carts, garbage bags, shelving units, clip strips, peg boards, and pallet jacks, to perform her work. Jewel-Osco Resp. PSOAF ¶ 89. However, AGC paid for some of these supplies, including the shelving units and peg boards, which were fixtures used to merchandise the AGC products, pursuant to its Supply Agreement with Jewel-Osco. Jewel-Osco Resp. PSOAF ¶ 89.

To keep her time, Albright used AGC's timeclock, not any Jewel-Osco timeclock. Pl.'s Resp. Jewel-Osco SOF ¶¶ 23, 31. Albright was paid hourly and issued paychecks by AGC, and received her W-2 from AGC. *Id.* ¶ 24, 31. Albright did not receive paychecks or W-2 from Jewel-Osco. *Id.* ¶ 48. Albright did not request time off from Jewel-Osco, and Jewel-Osco did not assign her stores. *Id.* 47–48 (Albright Dep. Vol. I 86: 2–4; 86: 7–12).

Albright and Jewel-Osco dispute whether any Jewel-Osco personnel gave Albright direction in servicing the Jewel-Osco. Jewel-Osco SOF ¶¶ 44–45; Pl.'s Resp. Jewel-Osco SOF ¶¶ 44–45. Albright describes that when working at Jewel-Osco, a Jewel-Osco manager would give her direction on where to place AGC products and permission to place products in certain areas of the store, which Jewel-Osco. Pl.'s Jewel-Osco PSOAF ¶ 87. Albright testified that she did not have to check in or out with anyone at Jewel-Osco. Pl.'s Resp. Jewel-Osco SOF ¶ 47.

14

Merchandisers used Account Service Record forms for each store visit, which indicate the date and time when that merchandiser worked at a store, the work they performed, and a signature from "store personnel" to verify their work. Pl.'s AGC PSOAF ¶ 56 (citing R. 98–5, Exh. 5, Kunde Dep. 34: 3–17, 45: 14–19; 48: 5–24; R. 98–6, Exh. 6 (AGC Form 301)). Jewel-Osco submits that the Account Service Record is an AGC form, and that neither Kunde, nor Jewel-Osco Store Director Phil Ireland, testified that AGC, or Jewel-Osco, required Jewel-Osco store personnel to sign the form. Jewel-Osco Resp. PSOAF ¶ 81–82. However, Albright testified that a Jewel-Osco manager needed to sign off on the Account Service Record before she left the Jewel-Osco. Pl.'s Resp. Jewel-Osco SOF ¶ 44 (citing R. 98–14, Exh. 14, Albright Dep. Vol. II 79: 10–17). Review of the Account Service Record form shows a column for "Store Personnel Signature" which is completed for most visits. Pl.'s Resp. Jewel-Osco SOF ¶ 48; AGC Form 301.

Defendant Richard Carlson was one of the Assistant Store Directors (ASD) at the Jewel-Osco located in Lockport, Illinois. Pl.'s Resp. AGC SOF ¶ 5; Jewel-Osco Resp. PSOAF ¶ 84. Specifically, Carlson was the ASD on the Osco side of the Lockport Jewel-Osco beginning in November 2017. Jewel-Osco SOF ¶ 37. In 2018, Carlson was 65 years old. AGC's Resp. PSOAF ¶ 63. In his role, Carlson was responsible for the whole Jewel-Osco store in the absence of the Store Director. AGC's Resp. PSOAF ¶ 63. Carlson reported to Ireland. Jewel-Osco SOF ¶ 37. Carlson would typically be the Jewel-Osco store personnel that signed off on Albright's Account Service Record. Jewel-Osco Resp. PSOAF ¶ 85 (citing R. 98–8, Exh. 8, Carlson Dep. At 64: 2–5).

Ireland was familiar with the vending community in the Lockport location, and made efforts to make vendors feel welcome, and it was his expectation that if a merchandiser had a problem, they would advise him. Jewel-Osco SOF ¶ 40. However, Ireland was not aware of any policy or practice where merchandisers were provided with information where they should go if they had a problem in the store. Pl.'s Jewel-Osco PSOAF ¶ 94.

## B. AGC and Jewel-Osco Policies and Procedures

AGC has anti-discrimination and anti-sexual harassment policies. Pl.'s Resp. AGC SOF ¶ 8. Kunde was familiar with those policies, and the fact they were distributed to merchandisers by Human Resources (HR). *Id.* ¶ 12. The employee manual included a number, or hotline, for employees to call to report violations of sexual harassment or discrimination. AGC SOF ¶ 13; R. 86–1, Exh. A–4, Albright Dep. Vol. I 16: 6–24; 17: 1–24, 22: 9–24, 23: 1–14. Kunde never advised Albright not to report to the hotline, or website used to report sexual harassment. Pl.'s Resp. AGC SOF ¶ 14. The AGC Code of Business Conduct & Ethics includes the following instruction on reporting, in relevant part: "Any time an Associate has any knowledge of a violation, the Associate has an affirmative duty either to 1) report such knowledge through the Company's normal reporting procedures; or 2) report it by calling the We Care Hotline at 1-800-235-1150[.]" R. 86-2, Exh. B-1, Code of Business Conducts & Ethics, at 10. The AGC handbook provides, in relevant part: "Associates who have complaints of discrimination, retaliation or harassment by anyone in the workplace, including any managers, supervisors, co-workers, or visitors, are urged to report such

conduct to their supervisor, manager or Human Resources representative so that the Company may investigate and resolve any problem." R. 86-2, Exh. B-2, AGC Handbook, at AGC1560. Upon report, the supervisor was instructed to "promptly report the incident to the Human Resources representative." *Id.*

Albright testified that she did not know there was an AGC employee handbook. Pl.'s AGC PSOAF ¶ 58. Albright further testified she received "some kind of manual" which included an 800-number, but "[e]verything was supposed to go through AJ [Kunde]." Albright Dep. Vol. II 17: 10–15.[8]

Jewel-Osco has an employee handbook which includes an "Equal Employment Opportunity (EEO) and Harassment" policy, which prohibits harassment, including sexual harassment, and provides a procedure for reporting inappropriate or harassing behavior. Jewel-Osco SOF ¶ 10. The handbook also includes a Sexual & Workplace Harassment Policy Acknowledgment," which is provided to and acknowledged by employees during onboarding, and on an annual basis. *Id.* ¶ 11. Jewel-Osco also has a Code of Business Conduct, stating it does not tolerate discrimination against or harassment of applicants, employees, customers, or vendors, and Jewel-Osco employees complete online training titled "Courtesy, Dignity, and Respect." *Id.* ¶¶ 12–13. Jewel-Osco has an Associate Relations/Human Resources Department that handles personnel matters, including a Loss Prevention Department that investigates claims of harassment, discrimination, and retaliation.

---

[8]Albright's deposition occurred over two days on April 29 and 30, 2021. For purposes of citation, the Court cites to the deposition transcript of Albright Dep. Vol. I, which is attached to AGC's SOF as Exhibit 1, and Albright Dep. Vol. II, which is attached to AGC's SOF as Exhibit 14.

*Id.* ¶ 14. That Loss Prevention Department also maintains a database about claims the Associate Relations Department is made aware of. *Id.* ¶ 15.

Albright was not given a Jewel-Osco employee handbook, or any written policies of Jewel-Osco, or subject to any training by Jewel-Osco. Jewel-Osco SOF ¶ 47 (Albright Dep. Vol. I 84: 7–11, 86: 13–14).

Kunde testified that merchandisers would be informed by store management of store-specific policies and procedures to follow. AGC's Resp. PSOAF ¶ 59. However, Ireland, the Jewel-Osco Store Director, testified that he was not aware of any documentation about Jewel-Osco's policies that were given to merchandisers. AGC's Resp. PSOAF ¶ 60.

### C. February 14, 2018 Incident

On February 14, 2018, Carlson arrived at Jewel-Osco at 7:00 a.m., and thought that the greeting card section looked depleted, and began moving cards in the greeting card section himself. AGC Resp. PSOAF ¶ 77. Albright arrived at the Jewel-Osco around 9:30 or 10:00 a.m., and Carlson was upset because she did not arrive by 8:00 a.m. *Id.* ¶¶ 78–79. Carlson testified that he told Albright she "should have been at my store because she was my card lady." *Id.* ¶ 80.

According to Albright, on February 14, 2018, Carlson "was going ballistic" because "he was mad that [Albright] was not coming back the next day to take down the Valentine's Day cards." AGC SOF ¶ 15 (Albright Dep. Vol. I 127: 11–24; 128: 1–2). Albright testified that every other word out of his mouth was "the F-word." *Id.* Albright did not report that Carlson physically touched her during this interaction.

18

Pl.'s Resp. AGC SOF ¶ 16. Following the incident, Albright informed Kunde that Carlson had yelled and swore at her for not immediately taking down the Valentine's Day display. *Id.* ¶ 18. Albright also told Kunde that, in the past, Carlson had touched her inappropriately. AGC Resp. PSOAF ¶ 84; Albright Dep. Vol. I 181: 23–24; 182: 1. This included removing items from her back pants pocket, including her box cutter or cell phone. *Id.*; Kunde Dep. 80: 7–13; 81: 12–19. Kunde testified that Albright reported Carlson taking her phone or box-cutter out of her back pocket was "playful" rather than in a sexually harassing manner. Kunde Dep. 27: 7–18. Albright testified that prior to February 14 she had previously told Kunde that Carlson would go into her back pocket when Kunde was in the store. Pl.'s Resp. Jewel-Osco SOF ¶ 54; Albright Dep. Vol. I 119: 10–15.[9] When this report was made is unclear. *Id.* On February 14, Ireland was in the store that day, and interacted with Albright, however, Albright did not report Carlson's conduct to him. Jewel-Osco SOF ¶ 53.

The same day, Kunde called Ireland and reported Carlson was "belligerent" with Albright, and used swear words, in front of customers and directly to Albright. AGC Resp. PSOAF ¶ 85; Kunde Dep. 85: 4–22; R. 98–7, Exh. 7, Ireland Dep. 118: 3–21; R. 99–3, Exh. 11, Jewel-Osco Investigation File at 22. Ireland told Kunde he would speak with Carlson, that his behavior would not be tolerated, that he would require Carlson to do the CDRT online training program, and he would apologize to Albright. Jewel-Osco SOF ¶ 55; Ireland Dep. at JEWEL-000228. Ireland was "certain" he spoke

---

[9]Prior to this report, Albright had also texted Kunde on December 7, 2017 that Carlson was at "my Jewel-Osco now, along with his attitude," to which Kunde responded Carlson is "retiring in the near future," and Albright responded with "Yes, thank god!!" Pl.'s AGC PSOAF ¶ 66. Kunde testified that Carlson could be "moody." *Id.* ¶ 67.

to Carlson about apologizing to Albright, however, Carlson did not recall being told to apologize to Albright. Pl.'s AGC PSOAF ¶ 86 (citing Ireland Dep. 61: 13–18). Carlson did not have to watch training videos. *Id.*; Carlson Dep. 68: 14–17.

The parties dispute when Kunde told her superiors about Albright's complaint. AGC SOF ¶ 20; Pl.'s Resp. AGC SOF ¶ 20. Albright contends that Kunde reported the February 14 incident to her superiors at AGC on February 17, 2018. Pl.'s Resp. AGC SOF ¶ 20. However, AGC suggests it was on an earlier date. AGC Resp. PSOAF ¶ 87. Whether Kunde reported Albright's complaint from February 14, 2018 to her superiors before February 17, 2018 is a disputed issue of fact. *Id.*; *cf.* Exh. B–4, Kunde Emails; Kunde Dep. 83: 7–11; 84: 11–15; *with* Kunde Dep. 108: 2–11.

Kunde reported Albright's complaint to Ireland, the Jewel-Osco Store Director. Pl.'s Resp. AGC SOF ¶ 22. Ireland told Kunde that Carlson would offer an apology to Albright. Pl.'s Resp. AGC SOF ¶ 23. Kunde, in turn, told Albright she should expect an apology from Carlson the next time she was at the Jewel-Osco. *Id.* ¶ 24. Kunde also informed her supervisor, Debbie Pott, and Ms. Grzybowski, an AGC Human Resources personnel member. *Id.* ¶ 87.

AGC also received a complaint from Jewel-Osco about AGC's plan not to remove Valentine's Day cards from the Lockport Jewel-Osco until February 20, 2018. Pl.'s Resp. AGC SOF ¶ 25. AGC, through Kunde, adjusted the plan to do the changeover on February 15, 2018. *Id.*

### D. February 15, 2018 Incident

Kunde assigned Albright to return to the Jewel-Osco in Lockport on February 15, 2018. Pl.'s AGC PSOAF ¶ 88. Albright asked that a co-worker, Cierra Falbo, accompany her to changeover the cards at the Lockport Jewel-Osco because she did not feel comfortable around Carlson. Pl.'s Resp. AGC SOF ¶ 26; AGC's Resp. PSOAF ¶ 88. Kunde granted Albright's request. Pl.'s Resp. AGC SOF ¶ 26.

On February 15, 2018, when Albright returned to the Jewel-Osco with Falbo, Carlson – without warning – approached Albright from behind and kissed her on her cheek. Pl.'s Resp. AGC SOF ¶ 27–28. Albright testified:

> [H]e kissed me on the cheek, which was so close to my mouth. By the time I turned to get away from him, it ended up on my mouth. So if you want to say where it started from and where it ended, how you interpret it, I don't know; but it was—technically it could have been both because—If I didn't move, it provably would have stopped on my cheek; but unfortunately, I moved to try and get away from him.

Albright Dep. Vol. I 156:11–167:3; *see also* AGC Resp. PSOAF ¶ 90.

Carlson stated he "walked up to her to shake her hand and say, 'I'm sorry about the incident.' . . . She turned away, and I gave her a peck on the cheek, said I was sorry." Pl.'s Resp. AGC SOF ¶ 29; Carlson Dep. 60: 17–21. Carlson also testified that Albright was with "some gal" he had never met before, referring to Falbo. Pl.'s Jewel-Osco PSOAF ¶ 117; Carlson Dep. 59: 18–60:1.

It is undisputed that Albright testified she felt Carlson put his hands on her hips, and gave her "a disgusting kiss." AGC's Resp. PSOAF ¶¶ 91–92; Albright Dep. Vol. II 94: 24–95: 1–11; 121: 13–17; 96: 7–12. Kunde testified that Albright told her she had to wipe off her cheek after the kiss. *Id.*; Kunde Dep. 96: 2–5; 121: 13–17.

21

Carlson denies grabbing Albright. AGC's Resp. PSOAF ¶ 94; Carlson Dep. 80: 15–17. He described the kiss as "an involuntary action" and "peck on the cheek." *Id.* ¶ 95; Carlson Dep. 62: 15–17; 63: 6. Carlson recalled that Albright did not appear to enjoy the kiss, and "shunned" him afterwards. *Id.* ¶ 96; Carlson Dep. 63: 12–15; 64: 22–24; 65: 1–3.

After leaving the store, Albright called Kunde to tell her what happened. Jewel-Osco SOF ¶ 61. Kunde was "shocked" by the report and that she "felt bad that she had experienced that." Jewel-Osco PSOAF ¶ 93; Kunde Dep. 97: 6–10. Kunde told Albright she would contact Ireland again. Jewel-Osco SOF ¶ 61; Albright Dep. Vol. I. 137: 3–6; Kunde Dep. 101: 13–17. Kunde and Ireland spoke again on February 17, 2021, and Kunde told Ireland Carlson came up from behind Albright and kissed her on the cheek. Jewel-Osco SOF ¶ 62; Ireland Dep. 145: 14–24; Kunde Dep. 99: 17–20. Ireland emailed AR and his District Manager to report Albright's claims. Jewel-Osco SOF ¶ 62; Ireland Dep. 146: 4–16.

Albright alleges that Carlson had an "inappropriate encounter" with her "very often" or "60 percent of the time if not more, maybe more." Albright Dep. Vol. II, 43:1–13. Albright testified that she reported to Kunde that Carlson was going into her back pocket. Pl.'s Resp. AGC SOF ¶ 34; Albright Dep. Vol. I 115: 8–11; 119: 11–14.

### E. Pre-February 14, 2018 Incidents[10]

What transpired between Albright and Carlson prior to the February 14 report is disputed. Specifically, Albright maintains that Carlson "always" wanted to hug her,

---

[10]Jewel-Osco includes a footnote in its Memorandum regarding Albright's interactions with Albright at the Homer Glen Jewel-Osco, a store Albright was not regularly assigned to but

and would tell her to "give me some love," on over 30 occasions. AGC Resp. PSOAF ¶ 68; Albright Dep. Vol. I 101: 5–7; 102: 12–21; 113: 14–17; 113: 23–24; 114:1–7. Conversely, Carlson testified that he had never hugged Albright before February 14, 2018, and that he never told her to "give him some love." AGC Resp. PSOAF ¶ 68; Carlson Dep. 49: 11–19. Further, Albright testified that Carlson would come up behind her and touch her back end and remove items from her back pocket. Pl.'s AGC PSOAF ¶ 69; Albright Dep. Vol. I 102: 6–18; 111: 5–8; 116: 17–24; 117: 1–4; 118: 116–21. Carlson also denies this. AGC Resp. PSOAF ¶ 69; Carlson Dep. 49: 20–24; 50: 5–8. Albright also testified that during her last month working at Jewel-Osco, Carlson would touch and stroke her hair, and comment about how she wore it. Pl.'s AGC PSOAF ¶ 70; Albright Dep. Vol. I 112: 12–16; 125: 8–126: 1.

Albright testified that it was "horrible" to see Carlson and that he made her "uncomfortable," and that she would repeatedly tell him to stop touching her, and yelled at him "I'm going to clock you if you don't knock it off." Pl.'s AGC PSOAF ¶ 72; Albright Dep. Vol. I 103: 19–22; 114: 13–20; 114: 23–115: 2; 117: 5–10; 119: 3–7; 164: 7–10. It is undisputed that when Albright would complain to Kunde about Carlson, the response was "[h]e's retiring soon." AGC Resp. PSOAF ¶ 75; Albright Dep. Vol. I 130: 7–10. Regarding the frequency of the conduct in Carlson removing items from

---

that she would service occasionally. Jewel-Osco argues all allegations relating to the Homer Glen store are time-barred. Jewel-Osco Memo. at 4, n. 2. Albright makes no response to this argument, and, accordingly, the Court will not consider allegations relating to Albright's interactions with Carlson at the Homer Glen location. *See, e.g.*, Pl.'s Resp. Jewel-Osco SOF ¶ 49. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.")

Albright's back pocket, Albright testified it was once per week or every other week. Pl.'s Jewel-Osco PSOAF ¶ 96; Albright Dep. Vol. I 117: 11–16.

### F. Written Complaint by Albright

Albright testified that she communicated a complaint of sexual harassment to Kunde about Carlson at least three times over February 14 and 15, 2018. Pl.'s Resp. AGC SOF ¶ 34. Before these reports, Albright had not asked Kunde to remove the Jewel-Osco from her route, reassign her, or intervene. Pl.'s Resp. Jewel-Osco SOF ¶ 51. However, the parties dispute whether Albright had previously complained to Kunde about Carlson going into her back pocket before the February 14, 2018 incident. AGC SOF ¶ 34; Pl.'s Resp. AGC SOF ¶ 34. Jewel-Osco SOF ¶ 54; Pl.'s Resp. Jewel-Osco SOF ¶ 54.

On February 17, 2018, Albright emailed Kunde a written complaint that she had "endured physical touching, harassment, abusive language and treatment" from Carlson and described this as a "Hostile Work Environment." Pl.'s AGC PSOAF ¶ 97; R. 98–9, Exh. 9, Kunde Emails. Albright also informed Kunde she would not return to the Jewel-Osco, and decided to file a police report about Carlson's conduct. *Id.* ¶ 97. Kunde responded to Albright's email that "I understand and support your decision not to go back into the Jewel-Osco Store. Your safety is more important than servicing the store. Please let me know if you need time off." Jewel-Osco SOF ¶ 64; Albright Dep. Vol. I 146: 16–148: 3; Kunde Emails at AGC0000231. AGC admits that Albright shared with Kunde that she was worried about losing her job because of the occurrence. AGC's Resp. PSOAF ¶ 99.

Before the written report to Kunde on February 17, 2018, Albright had not made any other written complaint about sexually inappropriate behavior, or sexual harassment, by Carlson. Pl.'s Resp. AGC SOF ¶ 35.

Additionally, it is undisputed that Albright never reported any issues to Ireland regarding Carlson, although she discussed the issues with the Jewel-Osco receiving manager and employees in the store's floral department. Jewel-Osco SOF ¶ 50.

Other than Albright's sexual harassment report, since Kunde began employment with AGC in 1998, there have no reports of sexual harassment by an AGC merchandiser. Pl.'s Resp. AGC SOF ¶ 11. Similarly, Jewel-Osco, had no record of any misconduct from Carlson before Albright's complaint. Jewel-Osco SOF ¶¶ 15, 42.

### G. Jewel-Osco's Investigation

Kunde informed Ireland of the February 15, 2018 complaint from Albright on February 17, 2018. AGC's Resp. PSOAF ¶ 101. No one from AGC contacted Carlson to discuss the incident. *Id.* ¶ 102. Jewel-Osco employees investigated. Jewel-Osco SOF ¶ 66. During the investigation, Carlson admitted to kissing Albright's cheek, denied telling Albright to "give me some love," and denied taking her phone or box cutter out of her pocket. Jewel-Osco SOF ¶ 67. Carlson was suspended pending review. *Id.* Jewel-Osco investigators met with Albright, Falbo and Kunde as well. *Id.* ¶ 68. Albright provided a statement that Carlson kissed her on her right cheek on February 15 to, in his words, thank her for coming in to change over the Valentine's

25

Day display. *Id.* Albright also wrote that Carlson swore at her on February 14, and in the last three months had hugged her "more than 30" times, said "give me some love," and took her phone or box cutter out of her pockets." *Id.*; Pl.'s Jewel-Osco PSOAF ¶ 95; Albright Dep. Vol. I 101: 5–7; 102: 12–21; 113: 23–24; 114: 1–7; 113: 14–17.

Based on the investigation, Jewel-Osco decided to terminate Carlson. Jewel-Osco SOF ¶ 69. Jewel-Osco suggested to Carlson that he resign in lieu of termination, and Carlson ultimately submitted a resignation in lieu of being terminated. Jewel-Osco SOF ¶¶ 70–71. Neither AGC nor Jewel-Osco informed Albright of the results of the investigation into Carlson's conduct. Pl.'s Jewel-Osco PSOAF ¶ 128.

Albright had also filed a police report against Carlson following the incident on February 15, 2018. Jewel-Osco's Resp. PSOAF ¶ 127. On February 28, 2018, Carlson was charged with battery in a criminal complaint, and ultimately pled guilty to that charge. Jewel-Osco Resp. PSOAF ¶ 127.

### H. AGC Business Changes

In March 2018 AGC began a restructuring of merchandising routes which was driven by its customers. Pl.'s Resp. AGC SOF ¶ 37; Kunde Decl. ¶ 9; R. 86–2, Exh. B–6, Restructuring Emails. Albright was unaware of the restructuring. Pl.'s Resp. AGC SOF ¶ 39. However, Albright believed that Kunde was retaliating against her by adding stores to her routes. *Id.* ¶ 40. AGC produced records which reflect the nature of the restructuring and talking points for managers to discuss those changes with their merchandizers. *See* Restructuring Emails at AGC 253–280. AGC contends the

documentation supports that several merchandisers were fired as part of the restructuring. AGC SOF ¶ 41. Albright disputes this on the basis that the documentation does not state or name any specific merchandisers were fired. Pl.'s Resp. AGC SOF ¶ 41. Other than disagreement with how to construe the documentation, Albright does not offer any competent evidence to dispute this fact. *Id.* Thus, the Court accepts AGC's contention, finding the talking points on how a manager should talk to a "merchandiser with no remaining accounts after routing changes" supports that certain merchandisers were, in fact, fired. *See* AGC 259.

## I. Albright's Complaint of Retaliation and Resignation

Albright alleges that AGC retaliated against her for complaining about sexual harassment by (1) giving her worse work assignments, (2) unfairly criticizing her work, (3) giving her more hours. Pl.'s Resp. AGC SOF ¶¶ 42–43. Specifically, Albright alleges she went from being assigned to the towns of Homer Glen, Lockport, and Lemont, to assigned to the towns of New Lennox, Homer Glen, Lockport, Lemont, and Mokena following the occurrences in February 2018. Pl.'s AGC PSOAF ¶ 109. Albright complained to Kunde that the routes she was assigned were giving her more than she already had on her plate. AGC Resp. PSOAF ¶ 107. Albright also testified that Kunde was "nitpicking" her work. *Id.* 108. Between February and June 2018, Kunde assigned Albright five additional stores. Pl.'s AGC PSOAF ¶ 111.

The parties dispute whether Albright worked more hours after she reported Carlson. *See* AGC SOF ¶¶ 45–47; Pl.'s Resp. AGC SOF ¶¶ 45–47. The only evidence advanced by AGC on this point was the hours summary information from Kunde's

Declaration. AGC SOF ¶¶ 45–47.[11] However, the summary document used by AGC to corroborate its position that Albright worked relatively consistent hours between 2017, 2018, and 2019, is not part of the summary judgment record, and is inadmissible. *See* Section I, *supra*. Hours aside, it is undisputed that Albright was assigned between four and five additional stores through the end of June 2018. Pl.'s AGC PSOAF ¶ 111; AGC's Resp. PSOAF ¶ 111. On a document showing Albright's assignments, AGC admits that Kunde wrote that she "evidently had been giving [Albright] a lot of work to do." *Id.* Both before and after the report, Albright was evaluated at AGC and was meeting AGC's expectations. *Id.* ¶¶ 48–49.

On June 15, 2019, Albright resigned from AGC. *See* Pl.'s Resp. AGC SOF ¶¶ 50–51. Albright provided this reason for her resignation: "I am no longer [sic] able to work for AG with everything you are throwing on my plate. It seems you were pushing me to quit. As a result, I have been left no choice other that [sic] to submit my resignation effective immediately." Pl.'s AGC PSOAF ¶ 112. Kunde, asked her to retract her resignation and remain employed. *See* Pl.'s Resp. AGC SOF ¶¶ 50–51.

## Legal Standard

## Analysis

Albright brings claims against both Jewel-Osco and AGC under Title VII for sexual harassment (Count IV) and against AGC only under Title VII for retaliation

---

[11]As for Albright, although she believed she worked between 30–40 hours per week after reporting Carlson, in reality she did not know how many hours she actually worked in 2017. Pl.'s Resp. AGC SOF ¶¶ 43–44.

(Count V). The Court first addresses Albright's sexual harassment claim, and then the retaliation claim.

## I.     Hostile Work Environment Based On Sexual Harassment (Count IV)

In Count IV, Albright claims she was subject to sexual harassment by Carlson when she was assigned to the Lockport Jewel-Osco, culminating in a sexual assault by Carlson on February 15, 2018. Compl. ¶¶ 13–27. For a hostile work environment, the complained-of conduct must "be sufficiently severe or pervasive to alter the conditions of employment such that it creates an abusive working environment." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009) (citing *Ezell v. Potter*, 400 F. 3d 1041, 1047 (7th Cir. 2005). To survive summary judgment on a sexual harassment claim, a plaintiff must adduce evidence sufficient for a reasonable jury to find that: "(1) her work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on her [sex]; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability." *Scruggs*, 587 F.3d at 840.

AGC contends that the alleged harassment was not based on Albright's sex, was neither severe nor pervasive, and that there is no basis for employer liability. AGC Memo. Summ. J. at 2–9.

Jewel-Osco argues that, as a threshold matter, Albright is unable to bring a Title VII claim against it because Jewel-Osco was not Albright's employer or joint employer. Jewel-Osco Memo. Summ. J. at 7–9. Alternatively, Jewel-Osco posits that even if it jointly employed Albright, her claim still fails because there is no strict

liability vis-à-vis Jewel-Osco, Albright's claim is defeated by the *Faragher*/*Ellerth* defense, and because the conduct was neither severe nor pervasive. *Id.* at 9–15.

Before evaluating the merits of the sexual harassment claim as to AGC and Jewel-Osco, the Court first must address Jewel-Osco's argument that there was no employment relationship between Albright and Jewel-Osco and, accordingly, Jewel-Osco cannot be liable to Albright under Title VII. Jewel-Osco Memo. Summ. J. at 7.

## A.    Joint Employer Relationship Between Jewel-Osco and Albright

The Court agrees with Jewel-Osco that Title VII claims can only be brought against an entity with which a plaintiff has "an employment relationship," but it is also true that, "[f]or purposes of Title VII, an employee can have more than one employer[; a]n entity can be an indirect employer or a joint employer or have some other complex combined relationship with an employee." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 905 (7th Cir. 2018) (internal citations omitted). When multiple entities may be involved in the employment relationship, the Seventh Circuit has instructed courts to apply the factors articulated in *Knight v. United Farm Bureau Mut. Ins. Co.*:

> (1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Johnson*, 892 F.3d at 905 (citing *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378–79 (7th Cir. 1991)). The ability to supervise and control employees is

the most important of these factors, and within the control factors, the ability to hire and fire is the most significant. *Bronson*, 2021 WL 1056847, at \*4 (citing *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 702–703 (7th Cir. 2015)).

Jewel-Osco and Albright agree upon the standard used for assessing whether an entity is a joint employer, but disagree whether there is, based on the record, evidence of a joint employer relationship. The Court addresses each *Knight* factor below.

### 1.      Control or Supervision

Jewel-Osco maintains that it exercised no control over Albright, except for "high level direction," such as removing certain displays. Jewel-Osco SOF ¶ 45. Jewel-Osco contends that it did not provide Albright with any training, nor did it provide Albright with its employee handbook, nor its policies. Jewel-Osco SOF ¶ 47. Jewel-Osco also highlights that time off requests were not made to Jewel-Osco, and that Jewel-Osco did not give Albright her store assignments. *Id.*

In response, Albright argues that jurors could find that Jewel-Osco maintained sufficient control and supervision over her, such that it was her joint employer. Pl.'s Jewel-Osco Resp. at 7. Albright does not contend that Jewel-Osco hired her, but does suggest Jewel-Osco had influence in whether or not she returned to the store. *See* Pl. Resp. Jewel-Osco SOF ¶ 83 ("they could have complained to American Greeting if for some reason I wasn't doing my job."). Albright also highlights her assertion that she was providing AGC's merchandising services subject to Jewel-Osco's policies and procedures, citing Albright's Jewel-Osco PSOAF ¶¶ 75–80. Albright points to Jewel-

Osco's request for Albright to change over the Valentine's Day display, and the accompanying change to her schedule to accommodate Jewel-Osco's request, as evidence of this purported control. Pl.'s Resp. Jewel-Osco at 8. Generally, Albright alleges Jewel-Osco would call her and ask her to come in when she was not scheduled to be there. *Id.*

Further, Albright states that Jewel-Osco managers gave her direction on where to place products, and permission to perform certain work, and "supervised" her when she was in the store. Pl.'s Resp. Jewel-Osco at 8. Albright points to statements made by Carlson to her as further evidence, e.g., "you work for me," describing her as "my card lady," and describing his work with Albright as on a "joint basis." *Id.* (citing Albright's Jewel-Osco PSOAF ¶¶ 106, 108, 109). Albright characterizes these statements as statements made by a party-defendant and high-level management employee. Pl.'s Resp. Jewel-Osco at 9.

In reply, Jewel-Osco argues that Albright exaggerates the AGC "Merchandiser Job Description" by omitting language. Specifically, Jewel-Osco's "policies/procedures" Albright alleges she had to follow of is incomplete; the full sentence reads "Follows Chain store policies/procedures as they affect the merchandising of the greeting card department and in matters of store security." Jewel-Osco Reply at 3 (quoting Jewel-Osco Resp. PSOAF ¶ 80). Jewel-Osco also disputes Albright's characterization of the request from Jewel-Osco that she changeover the Valentine's Day display immediately; Jewel-Osco contends that it was Kunde's testimony that Jewel-Osco notified her of the seasonal changeover, and

Kunde decided to rearrange Albright's schedule to accommodate Jewel-Osco's request. Jewel-Osco Reply at 3. Jewel-Osco accepts Albright's description of Jewel-Osco telling her where to place products, or permission to perform certain work, as "high-level direction," which, argues Jewel-Osco, under *Love*, is not sufficient to establish a joint employer relationship. Jewel-Osco Reply at 4 (citing *Love*, 779 F. 3d at 703). Finally, Jewel-Osco disputes Albright's contention that Carlson's statements were an admission by a party-opponent because they were not admissions, Carlson was not employed by Jewel-Osco during his testimony, and there was no "scope" of his employment concerning the agreement between Jewel-Osco and AGC. Jewel-Osco Reply at 5.

Finally, both parties focus on the Account Service Record that Albright would complete and submit to her supervisor, Kunde. Pl.'s AGC PSOAF ¶ 56. Albright insists that a Jewel-Osco manager was required to sign off on this form to verify or corroborate the work Albright performed at the Jewel-Osco that day. Pl.'s Jewel-Osco Resp. at 8. Jewel-Osco disputes that the sign off by Jewel-Osco store personnel was required, or that Albright was required to check in or out with Jewel-Osco personnel. Jewel-Osco Reply at 4. Instead, Jewel-Osco posits that the Account Service Record is an AGC form, provided to AGC employees by their AGC supervisors, for signing in and out of retail stores, and the purpose is for AGC to ensure the merchandisers work when they are onsite at a retailer. Jewel-Osco Reply at 4; *see also* Merchandiser Job Description. Nevertheless, Jewel-Osco admits that Carlson would typically sign off

on this form from Albright when she was at the Lockport Jewel-Osco. Pl.'s Jewel-Osco
PSOAF ¶ 85.

On this record, it is undisputed that AGC hired Albright in 2013, and re-hired
her in 2016 after she resigned her position with AGC in 2015. Pl.'s Resp. Jewel-Osco
SOF ¶¶ 16, 25–26. Albright was never terminated, but when she resigned from AGC
in 2016 she resigned to AGC, and when she resigned again in 2019, it was again to
AGC. *See id.* There is nothing in the record to suggest that Jewel-Osco had any ability
to hire or fire Albright, or review her performance, and the affirmative evidence in
the record suggests Jewel-Osco did not. Throughout her time working as a
merchandiser, Albright reported to AGC, specifically Kunde, an AGC employee, who
also evaluated her work, and worked with her on scheduling. Pl.'s Resp. AGC SOF ¶
9–10; Pl.'s Resp. Jewel-Osco SOF ¶ 19; Jewel-Osco SOF ¶ 22. Specifically, AGC would
assign Albright several retail stores, up to seven retailers at a time, and Albright
would put together a schedule for the week for her supervisor's approval. Jewel-Osco
SOF ¶ 22. Jewel-Osco was only one of those retailers. AGC also provided Albright
with information and "Best Practice" techniques, which she was required to follow
pursuant to her job description. Pl.'s Resp. Jewel-Osco SOF ¶ 18. Accordingly,
Albright followed AGC policies and protocol in discharging her responsibilities. *See
id.* It is undisputed that Albright never received Jewel-Osco policies or procedures to
follow. Jewel-Osco SOF ¶ 47. To the extent Jewel-Osco had a say in scheduling
Albright at the Jewel-Osco, as Albright argues, the evidence supports that the

requested scheduling change would occur through Kunde, who would communicate to Albright. *See* Pl.'s Resp. AGC SOF ¶ 25.

The Court finds the *Love* case, cited by Jewel-Osco instructive in evaluating the most important "control" factor. In *Love*, the Seventh Circuit acknowledged that in applying the control factor, "[i]f an employer has the right to control and direct the work of an individual, *not only as to the result to be achieved, but also as to the details by which that result is achieved*, an employer/employee relationship is likely to exist." *Love*, 779 F.3d at 703 (quoting *Alexander v. Rush North Shore Medical Center*, 101 F. 3d 487, 493 (7th Cir. 1996) (emphasis added). Applying this reasoning to a subcontractor working at a contractor site, the Seventh Circuit found that the employee generally received his instructions from his subcontractor, and only received direction from the contractor if they found the finished product unsatisfactory. *Love*, 779 F.3d at 703. In that case, the contractor would communicate further instructions to the subcontractor. *Id.* The Seventh Circuit characterized this as "minimal supervision" and limited to "the result to be achieved," militating against a finding of control. *Id.*

So too here, the Court finds Albright's allegations of control or supervision by Jewel-Osco, at best, to be allegations limited to the result to be achieved. *See Love*, 779 F.3d at 703. It is undisputed that Albright was assigned (by AGC) to seven different retailer locations at a time, only one of which was Jewel-Osco. Albright speculates that Jewel-Osco could affect her assignments, but this speculation falls short of establishing competent evidence that Jewel-Osco had any decision making in

Albright's assignments, or had the ability to influence Albright's continued employment with AGC, which was at-will pursuant to the AGC Handbook. For the example of the changeover following Valentines Day, the record supports that Kunde changed Albright's schedule to accommodate Jewel-Osco's request, not that Jewel-Osco went directly to Albright and changed her schedule. Pl.'s Jewel-Osco PSOAF ¶ 114; Jewel-Osco Resp. PSAOF ¶ 114. Further, the Account Services Record form, whether or not Jewel-Osco personnel needed to sign off on it, was an AGC form and assigned paperwork from AGC for its merchandisers, and ultimately submitted to AGC. Jewel-Osco PSAOF ¶¶ 80–82; Jewel-Osco Resp. PSAOF ¶¶ 80–82. That Jewel-Osco personnel would sign-off on that form does not support that Jewel-Osco controlled Albright's work, as the form appears to be a record or time-keeping form for AGC's purposes. *See id.*

Additionally, there is no evidence Jewel-Osco evaluated her performance. Albright worked with Kunde on her weekly schedule, and if she needed time off, she made those requests to AGC, not Jewel-Osco. Jewel-Osco SOF ¶¶ 22, 47. It was to AGC that Albright reported the harassment, and AGC that took her off the Jewel-Osco assignment, not Jewel-Osco. Pl.'s Jewel-Osco PSOAF ¶ 97; *See Wilcox v. Allstate Corp.*, 2012 WL 6569729, at *11 (N.D. Ill. Dec. 17, 2012) (finding no joint employment relationship where non-employer did not re-assign plaintiff, and if plaintiff had work-related questions, or needed to request time off, she went to the employer). Albright's own actions demonstrate that AGC had the ability to control her employment, not Jewel-Osco. *See id.*

36

The Court next addresses Albright's reliance upon statements made by Carlson to support that Jewel-Osco controlled or supervised her. Namely, that Carlson referred to Albright as "my card lady" and that he worked with her "on a joint basis." Pl.'s Resp. Jewel-Osco at 8. Although Albright refers to these statements as admissions by a party-opponent, the Court agrees with Jewel-Osco that they fail to meet the requirements of Federal Rule of Evidence 801(d)(2)(D). Fed. R. Evid. 801(d)(2)(D). Those statements would qualify as an admission by a party-opponent if they were (1) within the scope of Carlson's employment, and (2) if Carlson were performing duties of his employment when he came into contact with the particulate fact at issue. *Brama v. Target Corporation*, 2017 WL 2404954, at *3 (N.D. Ill. June 2, 2017). Here, the statements were from Carlson's deposition, when he was no longer a Jewel-Osco employee, and Jewel-Osco argues there was no defined "scope" of his employment with Jewel-Osco that concerns the terms of the agreement between Jewel-Osco and AGC. Jewel-Osco Reply at 5. The Court agrees with Jewel-Osco. There is no evidence that these statements were made by Carlson within the scope of his employment relationship with Jewel-Osco *and while it existed*. Further, such statements, even if they were admissions, do not overcome the undisputed record evidence which does not support that Jewel-Osco controlled or supervised Albright within the meaning of those terms in the joint employer context.

To the extent the Court can credit Albright's testimony that Jewel-Osco would direct some of her work, her description is comparable to the situation in *Love* where it was to the result to be achieved, *i.e.* changeover of the seasonal cards on a certain

date, and not concerning the details by which that result is achieved. *See Love*, 779 F.3d at 703. Albright offers no cases where a similar fact pattern existed, in the vein of a supplier and client relationship, where a court made a finding of joint employer. Further, Albright did not distinguish *Love* in her brief. *See* Pl.'s Resp. Jewel-Osco. The only case Albright relies upon to support her theory of joint employer, *Piano v. Ameritech/SBC*, is distinguishable. 2003 WL 260337 (N.D. Ill. Feb. 5, 2003); Pl.'s Jewel-Osco Resp. at 10.

In *Piano*, the plaintiff was an employee of a temporary employment agency, assigned to work at defendant Ameritech. 2003 WL 260337 at *2–3. A year later, Ameritech filled the plaintiff's position by hiring another employee from the temporary employment agency. Plaintiff filed suit under Title VII and the ADEA. Ameritech moved for summary judgment, arguing that it was not the plaintiff's employer. The issue before the court was whether the plaintiff, despite being technically employed by an employment agency, could use the joint employer theory to hold the employment agency's client, Ameritech, liable based on Ameritech's alleged control over the employee's day-to-day work activities. *Id.* at *5. The court denied the motion, finding that Ameritech could be found liable under a joint employer theory because Ameritech had the sole responsibility for directing the work the plaintiff performed, supervising her on how she performed it, and changing the plaintiff's specific job assignments. *Id.* Here, the relationship between AGC and Jewel-Osco is not one of a temporary employment agency and a client, but of a

38

supplier and client. Further, there is no evidence that Jewel-Osco ever hired Albright, or directed her day-to-day activities, or gave her job assignments.

In conclusion, the Court finds there is no material disputed fact that Jewel-Osco controlled or supervised Albright within the meaning of the *Knight* factors. This important factor weighs against a finding of joint employer.

### 2.     Occupation and Nature of Skill Required

This factor examines the occupation, nature of skill required, including whether skills are obtained in the workplace. *Knight*, 950 F.2d at 378–79. Jewel-Osco contends that the record shows that AGC, not Jewel-Osco, taught Albright "Best Practice" techniques, and that she received no training, no handbook, and no policies from Jewel-Osco. Jewel-Osco Memo. Summ. J. at 8. In response, Albright argues that although AGC trained her, the skills she obtained to merchandise at Jewel-Osco specifically were obtained at that store, pointing to the undisputed fact that "a Jewel-Osco manager would give [her] direction on where Jewel-Osco wanted to place products and permission to place products in areas of the store." Pl.'s Resp. Jewel-Osco at 9; citing Pl.'s Jewel-Osco PSOAF ¶ 87. Albright also points to the expectation that she follow the Jewel-Osco policies and procedures, and that Jewel-Osco employees performed the same merchandising work she performed. Pl.'s Resp. Jewel-Osco at 9.

The Court finds this factor weighs in favor of Jewel-Osco. It is undisputed that Jewel-Osco did not provide any training to Albright, or provide her with any of its policies or procedures, which undercuts any suggestion that Albright needed Jewel-

Osco-specific skills to perform her job. Thus, to the extent Albright argues she was required to follow Jewel-Osco specific policies and procedures, this is unsupported by the record. Although the merchandiser job description includes the requirement that a merchandiser follow store-specific policies and procedures, the facts do not support that Albright was given information on those policies and procedures, or trained on them, or followed them while at Jewel-Osco. Further, that a Jewel-Osco employee could tell her where to place products does not go to the nature of the skills for her position, rather this is related back to the analysis in Section I(A)(1), *supra*, that the supervision was not on how to perform her job, but the end result. Further, the training Albright did receive, and the "Best Practice" techniques she employed, were from AGC, not Jewel-Osco.

In short, Albright has failed to adduce sufficient evidence in the record to support this factor for joint employer as to Jewel-Osco.

### 3.    Costs of Operation

This factor looks to which entity or entities bore responsibility for the costs of the operation, including but not limited to equipment, supplies, fees, licenses, workplace, and maintenance of operations. Jewel-Osco argues that AGC provided Albright with equipment, including a tablet and a box cutter, and gave her access to its portal where she could receive information and communications for her job. Jewel-Osco Memo. Summ. J. at 8. Although Jewel-Osco paid for the products Albright was merchandising at its store, Jewel-Osco argues that the products were provided by AGC and shipped by AGC to Jewel-Osco. Further, Jewel-Osco contends that AGC

40

paid for the fixtures Albright used at the Lockport store. *Id.* Finally, Jewel-Osco concedes Albright would use a shopping cart to do her job at the Jewel-Osco. *Id.* at 9.

Albright counters that Jewel-Osco owned and operated the Lockport store where Albright performed services, and she did not have an office. Although Albright was paid by AGC, Albright posits that her work was funded by the contract between AGC and Jewel-Osco, and pursuant to that contract Jewel-Osco purchased AGC products and AGC provided the in-store merchandising for those products, in exchange for 5% of the cost of the cards. Pl.'s Jewel-Osco Resp. at 9. Finally, Albright testified that she used shopping carts, peg boards, garbage bags, shelving units, clip strips, pull carts, and pallet jacks of Jewel-Osco to perform her work. *Id.* at 10.

On balance, the Court finds this factor neutral, as both parties bore some responsibility for some of the costs of the operation relating to Albright's position.

### 4. Method and Form of Payment and Benefits

This factor considers which entity paid for an employee's labor and benefits. Here, both Jewel-Osco and Albright agree that AGC paid Albright and provided her with W-2s issued by AGC. Jewel-Osco SOF ¶¶ 24, 31; Pl.'s Resp. Jewel-Osco SOF ¶¶ 24, 31. Albright concedes this factor. Pl.'s Jewel-Osco Resp. at 10.

This factor weighs in favor of Jewel-Osco.

### 5. Length of Job Commitment and/or Expectations

This factor examines the length of the employee's job commitment to the entity. Jewel-Osco concedes that Albright was assigned to the Lockport Jewel-Osco for some time, but highlights the fact that Albright was servicing several stores for different

companies at the same time, and that her assignments were subject to change by AGC, not Jewel-Osco. Jewel-Osco Memo. Summ. J. 9.

In response, Albright invites the Court to consider a number of "what if" factors, citing *Frey v. Coleman*, 903 F. 3d 671, 680-681 (7th Cir. 2018). On that basis, Albright contends that "there is no reason to think Albright would not have continued to work at the Jewel-Osco in Lockport but for the harassment." Pl.'s Jewel-Osco Resp. at 10. Further, Albright argues she worked there on a long-term basis, and that it was not temporary assignment. *Id.* Albright also quotes Kunde and Ireland's praise of her work. *Id.*

The Court finds this factor is also neutral. It is undisputed that Albright did work the Jewel-Osco assignment over several years as an AGC merchandiser. However, the record also supports that Albright was an at-will employee of AGC, and that AGC had the discretion to re-assign her from the Jewel-Osco, which it did upon Albright's request.

Ultimately, the *Knight* factors do not support a finding of joint employer vis-à-vis Jewel-Osco and Albright. The undisputed evidence is that AGC hired Albright, paid her, evaluated her performance, scheduled her assignments, and trained her. When Albright resigned, she resigned to AGC. When she complained of harassment, she complained to AGC. The most important factor of control or supervision is not established by Albright as to Jewel-Osco. The situation is far afield from a situation like a temporary employment agency and placement of an employee; Albright serviced several stores (or accounts) for AGC, and the Lockport Jewel-Osco was only

42

one of those stores/accounts, and Jewel-Osco had no ability to assign Albright to the other stores. The Court finds that there was no joint employment relationship, and Jewel-Osco is therefore entitled to summary judgment as it cannot be liable to Albright under Title VII.

### B.    Albright's Sexual Harassment Claim Against AGC

The Court next addresses Albright's sexual harassment claim against AGC. AGC contends that the alleged harassment was not based on Albright's sex, was neither severe nor pervasive, and that there is no basis for employer liability. AGC Memo. Summ. J. at 2–9. The Court addresses each argument in turn.

### 1.    Treatment Based On Sex

AGC argues the conduct complained-of by Albright was not based on her sex. AGC Memo. Summ. J. at 2. Specifically, that the conduct occurred between a male and a female does not automatically mean it is sexual harassment, and the conduct must be "on account of" the recipient's sex. *Id.* at 2–3; citing *Chaparro v. City of Chicago*, 47 F. Supp. 3d 767, 774–75 (N.D. Ill. 2014).[12] AGC argues the February 14, 2018 incident involving Carlson yelling at Albright was not based upon sex and there was nothing sexual about it, as Albright admitted his conduct was due to him being upset about the Valentine's Day display. AGC Memo. Summ. J. at 4. AGC further

---

[12]AGC also argues it is entitled to a "safe harbor" defense as the conduct is "too tepid, intermittent, or equivocal[.]" AGC Memo. Summ. J. at 3; quoting *Galloway v. Gen. Motors Serv. Parts Operations*, 78 F. 3d 1164, 1168 (7th Cir. 1996). The Court addresses this argument in Section B(2) as it is directly related to the severity or pervasiveness of the conduct.

argues that Carlson's kiss – or "peck on the cheek" – on February 15, 2018, was not sexual. *Id.* at 6.

In response, Albright contends that Carlson's harassment "was based on sex given the obvious sexual nature of his advances towards Albright leading up to and including his disgusting kiss." Pl.'s AGC Resp. at 7. Albright highlights Carlson and Albright's respective ages, 65 and 45, and argues that "jurors could find the conduct would cause a reasonable woman to feel as though she is viewed and treated as a sex object rather than as a respected worker." *Id.* at 7–8. Finally, Albright points to certain language used by Carlson (describing the kiss as "an involuntary action" and calling Albright his "card lady" and Falbo "some gal") as evidence of his "discriminatory views of women." *Id.* (citing Albright's AGC PSOAF ¶¶ 95, 80, 89). Albright also argues that none of the cases cited to by AGC require ruling that Carlson's harassment was not based on sex as a matter of law. Pl.'s AGC Resp. at 8–9.

Although AGC confines the assessment of the conduct to Carlson's taking items from Albright's back pocket and the kiss, Albright also contends that he was always trying to hug her, asked her to "give me some love" on over 30 occasions, and that he commented on how he liked her to wear her hair, and stroked her hair. Pl.'s AGC PSOAF ¶¶ 68, 70. These allegations of physical touching, asking for "some love," and commentary on Albright's physical appearance support Albright's contention that Carlson's conduct was based upon her sex. And although AGC cites to a series of cases where summary judgment was granted to an employer despite "far more

44

objectionable and pervasive" conduct than the conduct described by Albright, the Court notes those cases did not involve repeated physical touching by the alleged harasser, or a kiss, or a criminal conviction for battery based upon the conduct. *See* AGC Reply at 3, n. 1. The details of the complained-of conduct are themselves disputed here, *i.e.,* whether the kiss was just a "peck on the cheek" or a "disgusting kiss," whether Carlson went into Albright's back pocket or not, whether he asked her for hugs and told her "give me some love," etc., and the Court is in no position to resolve these factual disputes on summary judgment. Construing the facts in the light most favorable to Albright, however, the Court finds these disputed facts support that the conduct was based upon her sex.

### 2.     Severe or Pervasive Conduct

In determining whether conduct is severe or pervasive enough to alter the conditions of employment and create a hostile work environment, courts consider both the actual effect of the conduct on the plaintiff (the subjective test) and what the effect would be on a reasonable person in the plaintiff's position (the objective test). *Soucie v. City of Braidwood, Ill.*, 2019 WL 1239781, at *6 (N.D. Ill. Mar. 18, 2019) (citing *Rodgers v. Western-Southern Life Ins. Co.,* 12 F.3d 668, 674 (7th Cir. 1993)). If the plaintiff "does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is not a Title VII violation." *Soucie*, 2019 WL 1239781, at *6 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)). Likewise, conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an

45

environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. *Id.* (internal citation omitted).

AGC characterizes Carlson's conduct towards Albright as "isolated incidents" involving yelling and then "pecking her on the cheek," even considering the allegation of Carlson removing items from Albright's back pocket. AGC Memo. Summ. J. at 7. AGC cites to *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995) for the proposition that these incidents "do not come close to rising to the level of severity or pervasiveness required by Seventh Circuit standards." Relatedly, AGC contends that it is entitled to a "safe harbor" because the conduct is "too tepid, intermittent, or equivocal to make a reasonable person believe that she has been discriminated against on the basis of her sex." AGC Memo. Summ. J. at 3.

Albright responds that her work environment was subjectively hostile based upon her reports and her testimony that it was "horrible" to see Carlson when working, and that he made her feel "uncomfortable." Pl.'s AGC Resp. at 10; Pl.'s AGC PSOAF ¶ 71. Albright argues that her work environment could be judged to be objectively hostile based upon "numerous unwelcome hugs, repeated touching of Albright's back side when she was bending over, stroking her hair, and a disgusting kiss[.]" Pl.'s AGC Resp. at 11. Albright cites to *Worth v. Tyler*, 276 F. 3d 249, 268 (7th Cir. 2001) for the proposition that "direct contact with an intimate body part constitutes one of the most severe forms of sexual harassment." Albright recognizes under the law that certain contacts may be "insufficiently abusive" if they occur in isolation, but emphasizes the repeat nature of Carlson's actions. Pl.'s AGC Resp. at

46

11 (citing *Hostetler v. Quality Dining*, 218 F. 3d 708, 808 (7th Cir. 2000) (cleaned up). Regarding the pervasiveness, Albright alleges certain of Carlson's conduct occurred approximately twice per week over approximately three months. Pl.'s Resp. AGC at 12–13. Finally, Albright disputes AGC's safe harbor entitlement, arguing that all of the incidents, taken together, could lead a reasonable person to believe she was subject to severe or pervasive harassment based on their sex. *Id.* at 9.

Reviewing the record in the light most favorable to Albright, the non-movant, as the Court must, the Court disagrees with AGC's description of Carlson's conduct as occurring in isolation. The Court is also loath to describe this series of actions, which includes allegations of repeated conduct and physical contact, and the undisputed fact that a police report was filed by Albright, which resulted in a criminal conviction for battery for Carlson, as insufficiently severe as a matter of law for purposes of a hostile work environment under Title VII. Again, many of the details of the complained-of conduct are disputed on this record, *i.e.* whether the kiss was just a "peck on the cheek" or a "disgusting kiss," whether Carlson went into Albright's back pocket and repeatedly touched her backside or not, whether he asked her for hugs and told her "give me some love," whether he stroked her hair, and how often these actions occurred, etc., and the Court is in no position to resolve these factual disputes on summary judgment, as it will ultimately come down to a credibility determination who the trier of fact believes. Resolution of those factual disputes – including whether and how often the conduct occurred – will necessarily impact whether a reasonable person would find Carlson's actions as creating a hostile or

abusive work environment. AGC is free to advance to a trier of fact that the complained-of conduct was neither severe nor pervasive, however the Court cannot find, based upon the undisputed evidence in the record, that as a matter of law the conduct was neither severe nor pervasive. The Court finds that AGC has failed to meet its burden to establish as a matter of law that material facts are undisputed such that the Court could find in its favor on Albright's sexual harassment claim.

The Court, having found a question of fact as to the severity and pervasiveness of Carlson's conduct, now turns to AGC's liability as Carlson's employer.

### 3. Employer Liability

The standard for employer liability depends upon the category of the harasser, for example whether the harasser was a supervisor or a co-worker. The category of harasser impacts the measure of employer liability. *Dunn v. Washington Cnty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005) ("When a supervisor causes the objectionable conduct, proof of reasonable care is an affirmative defense; otherwise the plaintiff bears the burden of showing that the employer knew of the problem (usually though not always this requires the employee to show that a complaint was made) and that the employer did not act reasonably to equalize working conditions once it had knowledge.")

Here, as Carlson was not Albright's supervisor, Albright "bears the burden of showing that [AGC] knew of the problem (usually though not always this requires the employee to show that a complaint was made) and that [AGC] did not act reasonably to equalize working conditions once it had knowledge." *Dunn*, 429 F.3d at

48

691. That Carlson was not AGC's employee does not matter for purposes of employer liability, and AGC does not argue to the contrary. *Id.* ("Because liability is direct rather than derivative, it makes no difference whether the person whose acts are complained of is an employee, an independent contractor, or for that matter a customer.")

AGC contends that even where sexual harassment is committed, an employer will not be liable where it has "an anti-discrimination or anti [sic] sexual harassment policy and the employee (i) is aware of it; and (ii) failed to take advantage of it." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08 (1998). This argument also pertains to AGC's affirmative defense. R. 45, AGC Answer at 12.

Here, AGC does not deny that it was on notice of Albright's reports regarding Carlson on February 14–17, 2018. Rather, AGC purports to contest how Albright made those reports to her direct supervisor instead of other reporting channels, and that Albright failed to make any written reports to anyone before February 17, 2018. AGC Memo. Summ. J. at 8–9. However, Albright testified that she understood to complain directly to Kunde. Pl.'s AGC PSOAF ¶ 62. Additionally, Albright brought the issue of Carlson going into her back pocket up to Kunde before February 14, 2018, while they were in the Jewel-Osco store. The date of that oral report to Kunde is unclear, along with what Kunde did in response to that report, if anything. And Kunde's description of Albright's report on this conduct when brought up again on

49

February 14, 2018 as "playful" is disputed by Albright.[13] These disputed facts, which also relate to AGC's affirmative defense, will be for resolution by the fact finder.

Additionally, the Court finds AGC's argument that Albright failed to follow its procedures in reporting the harassment unsupported. Both the Code of Business Ethics & Conduct and AGC Handbook provided that Albright could report directly to her supervisor, as she did. Code of Business Conducts & Ethics, at 10; AGC Handbook, at AGC1560. Relatedly, the reasonableness and promptness of AGC's response to the reports, the subject of AGC's affirmative defense, will be for the jury to decide. Thus, the Court finds that Albright has adduced sufficient information such that whether AGC is liable for Carlson's harassment based upon the reporting and reporting timeline remains an open question of fact.

In summary, Albright has adduced sufficient evidence on her sexual harassment claim against AGC, and there are several issues of material fact for resolution by a trier of fact. Accordingly, summary judgment on Count IV as to AGC is denied, along with summary judgment as to AGC's affirmative defense.

### C.    Albright's Retaliation Claim Against AGC

In Count V, Albright claims that AGC retaliated against her for complaining about Carlson's harassment. Title VII's anti-retaliation provision "prohibits retaliation against employees who engage in statutorily protected activity by

---

[13]In any event, Albright need not use "magic words" such as "sex" or "gender" harassment to make a complaint of sexual harassment. *See, e.g., Swinney v. Illinois State Police*, 332 Fed. Appx. 316, 318 (7th Cir. 2009) (citing *Sitar v. Ind. Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir.2003)).

opposing an unlawful employment practice or participating in the investigation of one." *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592–93 (7th Cir. 2008) (citing 42 U.S.C. § 2000e-3(a)). "To establish a ... retaliation [claim] under Title VII, [Albright] must show: (1) [s]he engaged in a statutorily protected activity, (2) [her] employer took a materially adverse action against [her], and (3) there is a causal link between the protected activity and the adverse action." *Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019).[14] On causation, Title VII retaliation claims "require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). The Seventh Circuit has instructed that the evidence should be considered as a whole to determine "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected activity] caused the . . . adverse employment action[s]." *Ortiz*, 834 F.3d at 763.

AGC does not challenge that Albright engaged in statutorily protected activity. AGC does counter that Albright has not identified any materially adverse actions that AGC took against her following her complaints about Carlson. AGC Memo. Summ. J. at 10–11. Specifically, to the extent Albright identifies increased hours or

---

[14]Albright does not make any allegations regarding similarly situated employees to suggest that the *McDonnell-Douglas* framework applies to her retaliation claim. 411 U.S. 792 (1973). No matter, as the Court considers the evidence as a whole in evaluating her retaliation claims as instructed by the Seventh Circuit in *Ortiz v. Werner Enterprises*, 834 F.3d 760, 763 (7th Cir. 2016). *See Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) (cleaned up) (clarifying that "there are not separate classifications of evidence to be evaluated under different standards" and that "[i]n the wake of *Ortiz*, 'the *McDonnell Douglas* framework is just a formal way of analyzing a discrimination case when a certain kind of circumstantial evidence—evidence that similarly situated employees not in the plaintiff's protected class were treated better— would permit a jury to infer discriminatory intent.'")

assignments as adverse actions, AGC explains that it underwent a restructuring in March 2018 which impacted merchandising routes, which was driven by AGC's customers. *Id.* at 11. Further, Albright was retained through this restructuring, although other merchandisers were terminated, and Albright continued to receive positive reviews from AGC before and after her complaints about Carlson. *Id.* at 11–12. Finally, Albright resigned, and was never terminated by AGC. *Id.* at 12. On causation, AGC states that "no adverse employment action was suffered by Plaintiff *after and as a result of her complaints of sexual harassment.*" *Id.* (emphasis added).

In response, Albright contends that a finder of fact could find she suffered a materially adverse employment action when (1) Kunde began over-scrutinizing her work, and (2) changed her routes so she needed to travel outside her home demographic of stores. Pl.'s AGC Resp. at 17. Albright also cites to Kunde's testimony that she was giving Albright "a lot of work to do." *Id.* Albright identifies five additional stores she was assigned, and that she had to work in different towns. *Id.* Albright argues that giving her "more work, at more stores, to be performed in the same limited amount of budgeted time, might dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.*

Albright makes no response to AGC's identifying the restructuring as a reason for change in hours or routes, and does not respond to AGC's assertion that Albright continued to receive positive performance reviews before and after the complaints about Carlson. Pl.'s AGC Resp. at 17.

In reply, AGC argues that Albright's two challenged adverse employment actions are "deficient as a matter of law." AGC Reply at 10. First, asserts AGC, Albright does not and cannot dispute that her pre- and post-complaint performance reviews indicated she was meeting AGC's expectations. AGC cited to *Blackmon v. City of Chicago* to support that Albright's allegation of "increased scrutiny" is insufficient to qualify as a materially adverse employment action. 836 F. Supp. 2d 655, 665 (N.D. Ill. 2011) (being "subject to increased scrutiny," and an increased workload, among other actions, did not "rise to the level of materially adverse."). Regarding the allegation of increased hours and additional routes, AGC notes that during her deposition Albright could not testify as to the total hours she was working. *See* Pl.'s Resp. AGC SOF ¶¶ 43–44. As discussed in Section I, *supra*, AGC's hours summary is not admissible. Nevertheless, AGC insists that Albright's testimony on increased hours is not sufficient to establish a materially adverse employment action, either, as she did not establish any harm.[15] AGC Reply at 12–13 (citing *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F. 3d 651, 654–55 (7th Cir. 2010)).

AGC also cites to cases where increased, changed, or more difficult work assignments were insufficient to establish any materially adverse employment action under Title VII. *Id.* at 13; *see, e.g.*, *Hobbs v. City of Chicago*, 573 F. 3d 454, 463 (7th Cir. 2009) (rejecting argument that being given "undesirable assignments" which were within employee's job duties, was evidence of retaliation where there was no evidence of loss of a job title or receiving less pay); *Minor v. Centocor, Inc.*, 457 F.3d

---

[15]For example, Albright makes no allegation that she was not paid for all hours worked.

632, 635–36 (7th Cir. 2006) (plaintiff's larger territory than her peers was not evidence of discrimination based on sex or age); *Mangano v. Sheahan*, 2002 WL 1821738, at *21 (N.D. Ill. Aug. 7, 2002) (holding that "plaintiff cannot rely on the fact that she received difficult work assignments in unfamiliar districts to show that she suffered an adverse employment action."). Lastly, posits AGC, even if the actions were adverse actions under the law, Albright cannot establish that her reports of harassment were the but-for cause of any of the claimed adverse actions as required by law, pointing to AGC's restructuring and changing business needs as the reason for those changes. AGC Reply at 14; *see Nassar*, 570 U.S. at 352 (2013).

The Court agrees with AGC. Fundamentally, "the reassignment of job responsibilities are typically not materially adverse unless there is a 'significant alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects.'" *Brownlee*, 2022 WL 602652, at *31 (citing *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009)). Here, while Albright alleges an increase in hours and assignments, and being subject to increased scrutiny, these actions on their own, or considered together, do not support a materially adverse action. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (no adverse employment action where plaintiff was given "additional work that she perceived as outside her normal job responsibilities"); *see also Blackmon*, 836 F. Supp. 2d at 665. Furthermore, Albright also fails to support her "increased scrutiny" assertion in the face of her undisputedly consistent performance reviews, and without arguing any material injury or harm, as required. *Lewis*, 909 F.3d at 870 (citing cases

"supporting the proposition that an adverse action in the Title VII retaliation context must produce a material injury or harm, and that unfulfilled threats do no meet that standard.").

Further, even if the Court could find these actions were materially adverse under the law, Albright does not argue that these actions were causally related to her reports regarding Carlson, instead arguing that AGC did not argue there was no causation, and based on her brief, Albright does not make any argument on the causation factor. Pl.'s AGC Resp. at 16 ("AGC argues only that Albright did not suffer a materially adverse employment action.") However, in its memorandum, AGC did argue that "no adverse employment action was suffered by [Albright] after *and as a result of her complaints of sexual harassment*." AGC Memo. Summ. J. at 12 (emphasis added). True, the argument could have been more developed by AGC. However, the Court finds that AGC did include the argument in its memorandum, and Albright did not substantively respond. Based upon the undisputed record evidence, the Court finds that AGC did offer legitimate business reasons for the change in hours and additional routes for Albright, namely its restructuring of the merchandiser position, which undermines Albright's suggestion of causation between her complaints and the challenged actions. Albright does not respond to, let alone argue that the reason provided by AGC is pretextual, i.e. namely its restructuring that impacted merchandisers, and which even led to certain merchandisers being let go, but not Albright. Further, Albright has not identified similarly situated individuals she alleges were treated more favorably. Thus, considering the undisputed evidence as a

whole, as the Court must, there is no evidence the complained of actions taken by AGC which affected Albright's position were casually related to Albright's complaints about Carlson.

Without having produced sufficient evidence that she suffered any materially adverse action, or that the complained-of actions were casually related to her complaints, Albright's retaliation claim cannot proceed to trial. The Court cannot conclude from the record that a reasonable person in Albright's situation would have been dissuaded from reporting Carlson's harassment. AGC's motion for summary judgment with regard to Count V is granted.

**Conclusion**

For the foregoing reasons, AGC's motion for summary judgment [84] is granted in part and denied in part, and Jewel-Osco's motion for summary judgment is granted [87]. Jewel-Osco is terminated from the case.

By September 12, 2023, Albright, AGC, and Carlson are directed to file a status report indicating: (1) whether the parties would like a referral to the Magistrate Judge for a settlement conference; (2) whether the parties consent to proceeding with trial before the Magistrate Judge, (3) whether the parties consent to a bench trial, (4) the anticipated number of days for trial (accounting for voir dire), (5) the expected number of witnesses; and (6) if the parties do not consent to proceeding before the Magistrate Judge, their availability for trial in early Spring 2024.

Dated: August 25, 2023

United States District Judge
Franklin U. Valderrama